IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


ROBERT FRANK HAYDEN,
      Petitioner,

vs.                                    Case No.:  3:04cv119/RV/EMT

JAMES V. CROSBY, JR.,
      Respondent.
_____/

## REPORT AND RECOMMENDATION

     Before the court is a petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (Doc. 1).  Respondent filed an answer asserting that one of the six claims raised in the petition was not exhausted in the state courts and is procedurally barred, and Petitioner is not entitled to federal habeas relief on the remaining claims (*see* Doc. 10).  Petitioner filed a response to the answer (Doc. 17).

     The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D.Fla. Loc. R. 72.2(b).  After a careful review of the state court record and consideration of all issues raised by Petitioner, it is the opinion of the undersigned that an evidentiary hearing is not required for disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases.  It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.      BACKGROUND

     Following a jury trial, Petitioner was found guilty of three counts of sexual battery upon a victim less than 12 years of age by a defendant over 18 years of age, one count of battery, one count of lewd and lascivious molestation, and one count of lewd and lascivious act (Doc. 12, Exs. A, C, H at 72). On October 12, 2000, Petitioner was sentenced to three terms of life imprisonment on the

sexual battery counts, one year of incarceration on the battery count, thirty (30) years of incarceration on the lewd and lascivious molestation count, and fifteen (15) years of incarceration on the lewd and lascivious act count, all terms to run concurrently (*id.*).  Petitioner directly appealed his convictions and sentences to the Florida First District Court of Appeal ("First DCA").  The appellate court affirmed the convictions and sentences per curiam without opinion on October 25, 2001, with the mandate issuing November 13, 2001 (Doc. 12, Ex. F).  Hayden v. State, 798 So.2d 726 (Fla. 1st DCA 2001) (Table).  Petitioner did not seek certiorari review by the Florida Supreme Court or the United States Supreme Court.

On November 7, 2002, Petitioner filed a motion for postconviction relief under Rule 3.850 of the Florida Rules of Criminal Procedure (Doc. 12, Ex. G).  The trial court denied the motion without an evidentiary hearing on August 20, 2003 (*id.*, Ex. H).  Petitioner appealed the decision to the First DCA, and the appellate court affirmed on March 12, 2004, with the mandate issuing April 7, 2004 (*id.*, Ex. J).  Hayden v. State, 869 So.2d 544 (Fla. 1st DCA 2004) (Table).

Petitioner filed the instant petition on April 1, 2004 (Doc. 1 at 7).  Respondent concedes the petition is timely (Doc. 10 at 5).

## II.   TRIAL EVIDENCE

Resolution of Petitioner's claims requires thorough consideration of the evidence adduced at trial.  Therefore, a summary of this evidence follows.

Mary Mortimer was nine years old at the time she testified at Petitioner's trial (Doc. 12, Ex. B at 130).  She stated she previously lived with her mother, Mary Anne, sister, Amanda, and "Frank" (*id.* at 132).  Mary testified Frank babysat her during the week when her mother worked at Whataburger (*id.*).  She said her mother worked "a lot" (*id.*).  Mary testified she knew the difference between good and bad touches, and that Frank had touched her in an inappropriate way (*id.* at 133-34).  Mary testified that Frank began touching her in her "private" area [1]  when she was eight years old, approximately six months prior to her sister's reporting the abuse to their mother (*id.* at 134-37).  Mary stated Frank touched her private area with his finger when she was unclothed (*id.* at 135, 148).

---

[1]The witness demonstrated to the jury what she referred to as her "private" area by standing and pointing to it (*id.* at 134-35).

She testified she, Frank, and Amanda played "strip poker," during which they would remove their clothing (*id.* at 138).  She also stated they played "the riding game" in her mother's bed (*id.* at 138-39).  During "the riding game," Frank would lie unclothed on the bed and she would sit unclothed on his private area facing him and rubbing back and forth (*id.* at 139-41).  Mary testified she felt Frank's private area, but she could not remember where she felt it touch her (*id.* at 140).  She also testified Frank put his tongue on her private area and licked her when they were unclothed (*id.* at 142-43).  Mary said this also occurred on her mother's bed (*id.* at 143).

Mary testified that Amanda was always present when this interaction occurred between Frank and her (*id.* at 150).  She also testified she saw Amanda play the riding game with Frank, that they played the game the same way he played it with her, and that they were unclothed (*id.* at 143-44).  Mary stated she also saw Frank touch Amanda's private area with his finger when she was unclothed, as well as put his tongue on Amanda's private area (*id.* at 145-46).  Mary stated she saw this interaction between Amanda and Frank during the six-month period that Frank was touching her (Mary), but Amanda told her it had been occurring prior to that (*id.* at 146).  Mary testified Frank told her not to tell anyone about their games (*id.* at 147).  Mary then identified Petitioner as "Frank" (*id.*).

Amanda Mortimer was eleven years old when she testified at Petitioner's trial (*id.* at 164).  She testified she currently lived in South Carolina, but prior to that she lived in Pensacola with her mother, sister, Mary, and Frank (*id.* at 165-66).  At that time, she testified, Frank babysat her and Mary everyday while their mother was working at Whataburger (*id.* at 166).  Amanda stated Frank touched her with his hands on her "lower part," where she goes to the bathroom (*id.* at 167).  Amanda did not remember whether she was clothed or unclothed when he touched her with his hands (*id.*).  She stated Frank began touching her that way when she was nine years old, and it continued for approximately one year prior to the week before he was arrested, although she did not recall when he was arrested (*id.* at 167-68).  Amanda testified Frank stopped touching her after she told her mother about it (*id.* at 168).  She did not remember whether she saw Frank do anything bad to Mary, nor did she recall playing any games with Frank (*id.* at 169-70).  Amanda identified Petitioner as the man who touched her (*id.* at 170).

On cross-examination, Amanda testified Mary was in a bedroom across the hallway from her mother's bedroom when Frank touched her (Amanda) with his hands (*id.* at 171).  She stated she told Mary about Frank's touching her (*id.*).  Amanda did not remember whether she had ever seen Frank naked (*id.*).

Mary Anne Mortimer, the mother of Mary and Amanda, testified that Frank was her boyfriend when the abuse occurred (*id.* at 172-73).  She stated the four of them lived together from June of 1997 until November of 1999 (*id.* at 173-74).  Ms. Mortimer identified Petitioner as Frank (*id.* at 174).  She stated she was working at Whataburger at that time between 40-80 hours per week, and Frank babysat Mary and Amanda when she worked (*id.* at 175).

Ms. Mortimer testified she became aware that something had occurred between Frank and her daughters in November of 1999 (*id.* at 175).  She stated she and the girls were in the car, and Amanda asked her if they could talk when they arrived home (*id.* at 176).  Upon their arrival at home, Amanda told her mother, "Frank's been messing with me," and that he had been playing "the riding game" with her (*id.*).  Ms. Mortimer stated she did not want to believe Amanda, so she confirmed her story with Mary, who was in another area of the house when Amanda revealed the abuse (*id.*).  Ms. Mortimer asked Mary the kind of games they played when she (Ms. Mortimer) was not there, and Mary responded "the riding game" (*id.*).  Amanda told her mother they had been playing the game from October of 1998 until the weekend before Amanda revealed this information to her (*id.* at 177).  Ms. Mortimer testified that Amanda's grades had dropped beginning in October of 1998 (*id.* at 178).  She stated she contacted the police the morning after Amanda told her of the abuse (*id.* at 177).

Brandy Strahan, a nurse case coordinator with the Child Protection Team, testified that on November 4, 1999, she conducted a forensic interview of Mary and Amanda Mortimer regarding alleged sexual abuse (*id.* at 203-04).  Ms. Strahan stated she interviewed each girl alone, with no one else in the room, and that she asked questions about their age or school, then discussed colors, reviewed the difference between truth and falsehoods, discussed body parts, and then discussed the alleged incident (*id.* at 204-05, 208).  Ms. Strahan videotaped the interviews and drafted an interview summary based upon the videotape (*id.* at 204).  Ms. Strahan stated the girls were so soft spoken that the microphone did not did not pick up their statements, therefore, the majority of the

videotape consisted of her repeating the girls' statements (*id.* at 205).  Ms. Strahan testified that the videotape was a fair and accurate representation of her interview with the children (*id.* at 206).  Ms. Strahan then testified as to what each child told her regarding the sexual abuse.[2]

Ms. Strahan testified Amanda told her Frank had touched her "privacy" with his fingers and with his "privacy" (*id.*).  Amanda stated the incidents occurred in her mother's bedroom (*id.* at 206-07).  She said Frank made her take her clothes off, and he had his clothes on, but then later took them off (*id.* at 207).  Amanda said she and Frank played a came called "the ride" during which Frank would lay down and she would get on top of him and rock back and forth (*id.*).  She said they both were unclothed (*id.*).  Amanda stated she saw Frank's "privacy" and described it as a hose that felt like rubber (*id.*).  Ms. Strahan stated Amanda denied any kissing or oral sex (*id.* at 207-08).

Ms. Strahan testified Mary told her that Frank "messed with her privacy" by touching her with his fingers, licking her privacy and doing "the ride" (*id.* at 208).  She stated their clothes were off during these activities (*id.*).  Mary described "the ride" as getting on top of Frank (*id.*).  Mary said she touched Frank's private area and described it as "gooey" (*id.* at 209).  She stated Frank and Amanda told her these activities were secret and that she could not tell anyone (*id.*).

Ms. Strahan testified she asked each child to demonstrate with dolls what they did with Frank, and the girls placed the male doll on its back facing up and placed the female doll on top of the male, face-to-face, and rocked the dolls back and forth (*id.* at 209).

On cross-examination, Ms. Strahan stated that when Mary was initially interviewed, she stated Frank licked her bottom, but in Strahan's interview summary, she wrote that Mary said Frank "licked her privacy" (*id.* at 213-15).  Ms. Strahan testified Mary said she did not remember what Frank's "privacy" looked like (*id.* at 217).  Strahan also stated Amanda told her Mary had been abused only once, but Mary stated it happened once a week (*id.* at 219).  Finally, Ms. Strahan testified that when the girls demonstrated with dolls their activities with Frank, they did not unclothe the dolls (*id.* at 221).

---

[2]Prior to trial, a hearing was conducted on the issue of the admissibility of Ms. Strahan's testimony regarding statements made by the children during the interview.  Petitioner's counsel argued Ms. Strahan should not be permitted to testify to statements made to her by the children because there were insufficient indicia of reliability (Doc. 12, Ex. B at 85-101).  The trial court overruled the objection by the defense and permitted the testimony (*id.* at 94-96, 323-26).

The final witness was Chuck Hughes, a police officer with the Pensacola Police Department (*id.* at 223-24).  He stated he was assigned to investigate the case on November 3, 1999 (*id.* at 224).  Hughes testified he first interviewed Mary Anne Mortimer and recorded her statement (*id.* at 225).  He then arranged the videotaped interview with the girls and the Child Protection Team (*id.*).  He stated the interview occurred on November 4, 1999, and he watched the interview in a room adjacent to the interview room (*id.*).  Hughes testified that on November 4, 1999, he contacted Mary Anne Mortimer and asked her to participate in a recorded conversation with Petitioner in an attempt to obtain additional evidence (*id.* at 226).  He stated Ms. Mortimer consented to the recorded conversation (*id.*).  Hughes produced and authenticated the audiotape of the conversation (*id.* at 226-27).  The tape was admitted into evidence over the objection of Petitioner's counsel (*id.* at 227).

After the conversation between Petitioner and Ms. Mortimer occurred, Officer Hughes contacted the Escambia County Sheriff's Department and asked them to take Petitioner into custody (*id.*).  Following Petitioner's booking at the county jail, Hughes interviewed Petitioner (*id.* at 228).  Hughes testified he advised Petitioner of his Miranda[3] rights prior to Petitioner's statement by reading aloud a form containing the Miranda warnings (*id.* at 229-30).  Hughes then questioned Petitioner as to whether he understood his rights, to which Petitioner responded affirmatively; Petitioner then stated he wished to waive his Miranda rights and signed the form indicating his waiver (*id.* at 230).  Hughes testified he did not promise Petitioner anything in exchange for the waiver, nor did he threaten Petitioner to obtain the waiver (*id.*).  Officer Hughes testified that at no time during the interview did Petitioner indicate he needed to use the bathroom or required food or drink, nor did Petitioner request that the interview stop (*id.* at 231).  Hughes then identified Petitioner as the person he interviewed (*id.* at 232).  Finally, Hughes testified that prior to the start of the audiotaped statement, Petitioner told him that he felt it was his responsibility to teach the girls about sex (*id.* at 242).  Hughes testified that Petitioner made this statement after the Miranda warnings, but admitted he did not record the statement in any of his reports (*id.*).

The prosecution offered the videotapes of the girls' interviews with Ms. Strahan into evidence (*id.* at 245).  Defense counsel objected on the grounds that the evidence was cumulative,

---

[3]Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

violated Petitioner's right to confront witnesses, and constituted impeachment evidence of prior inconsistent statements (*id.*).  The objections were overruled, and the tapes were published to the jury (*id.* at 249-70).[4]

The prosecution then published the audiotape of the conversation between Petitioner and Mary Anne Mortimer.[5]  The relevant portion of the conversation is as follows:

> SPEAKER 1 [Mary Anne Mortimer]:  Tell me again, you know, because it's hard for me to work out.
> SPEAKER 2 [Petitioner]:  It started about nine months ago, I guess, and started when someone came home from someone else's house and had a bunch of ideas because of what they had seen.  And then after that, it's periodically, I'd catch them sitting around –
> SPEAKER 1:  Wait, you're talking about when Amanda went over to Lauren's?
> SPEAKER 2:  Well, both of them actually.  Both of them seen it.  You told me that Mary did.  I didn't know about that.
> SPEAKER 1:  Uh-huh.
> SPEAKER 2:  And I'm not sure what went over there.  But when it came back to the house, I tried avoiding it.  They'd want to watch stuff on our TV and I wouldn't let them do that.  And if I did flip through that channel, it didn't stay there but a second and then I was off of it, and I'd make sure they were in their room.  After that, it was basically catching them scratching themselves is what they said.  I mean, even like if you were sitting in the kitchen, I'd walk in the room getting ready to go to work, someone is sitting there scratching themselves.  It was oh, I itch.  I'm like, well, leave that itch alone.  I don't know.  One thing led to another.
> SPEAKER 1:  How far did it go?
> SPEAKER 2:  Basically pet.
> SPEAKER 1:  What do you mean?  I want –
> SPEAKER 2:  Just like I play with you.  But not quite as much.
> SPEAKER 1:  Do you realize how bad you can hurt them?
> SPEAKER 2:  Yes, and I'm glad you found out so it will stop, because it was bothering me.  Couldn't you tell?  I didn't know what to do.
> SPEAKER 1:  (inaudible) if I could tell, don't you think I would have figured this out earlier?  If I could tell anything?
> SPEAKER 2:  But I didn't know what to do, Mary.

---

[4]At defense counsel's request, the videotapes were redacted of each child's statements concerning statements of the other child (Doc. 12, Ex. B at 85-101).

[5]Defense counsel objected to admissibility of the audiotape, but the objection was overruled (Doc. 12, Ex. B at 103, 226-27).

SPEAKER 1:  This – this isn't – don't even go there.  This is nothing that – to do with me.  I was – I was trusting you to watch my kids when I went to work.

SPEAKER 2:  Yes, it's gonna bother them.  I don't know if it bothers them.  That's – see, it wasn't against their will.

SPEAKER 1:  Did you feel like you're a teacher or something?

SPEAKER 2:  No.  Amanda used to come out and sit on the couch beside me.  And she would always tell me, [w]ait until Mary goes to sleep.  And I was like, [f]or what?  This is what I'm talking about.  It wasn't against her will.  That's what scared me.  I'm not saying it's her fault.  She's young.  It's my fault.  I should have known better.  I'm stupid.

SPEAKER 1:  You know, I keep talking to them and I keep hearing about this riding game.  What the hell is that?  I have –

SPEAKER 2:  We played a –

SPEAKER 1:  -- fifty million things going through my mind what this could be.

SPEAKER 2:  We played a game of cards.  And when you lost, then you had to take your top off or your socks off or something like that.  And then after you took off as much clothes as you possibly could, then if you lost again, you had to start putting clothes back on.  That's what that was about.

SPEAKER 1:  That was the riding game?  That has nothing to do with riding.  That has to do with taking your clothes off.  What – what – explain this to me.

SPEAKER 2:  Amanda used to come –

SPEAKER 1:  When I'm thinking riding, I'm thinking penetration here, Frank.

SPEAKER 2:  No, no.  I didn't penetrate your daughters.  Don't think that.  They can tell you that.  Don't even go that far.  What I'm talking about is Amanda would sit on my belly and ride me like a horse.  You know, like straddle me?

SPEAKER 1:  Uh-huh.

SPEAKER 2:  They used to do that when I was sitting on the couch.  It didn't really get me excited.  I was just sitting there watching TV.  It's just like she would sit in my lap.

SPEAKER 1:  With her clothes on?

SPEAKER 2:  Yeah.

SPEAKER 1:  Anything else at all?  I need to know everything.  There's a lot of healing that has to go on here.  I have –

SPEAKER 2:  I know.

SPEAKER 1:  -- to know how far I have to go.

SPEAKER 2:  I know.

SPEAKER 1:  Was there anything else?

SPEAKER 2:  Not that I haven't covered.  I'm trying to think.  My mind's going, too.

SPEAKER 1:  (inaudible.)

SPEAKER 2:  Because I lost control.  Because you wasn't there.  Because every weekend I had to babysit.  And every weekend I just felt I couldn't go anywhere.  That's why sometimes I wanted to go and I made your kids go to your dad's house so I could do it.  And I felt trapped, when you're not the trapping kind.

SPEAKER 1:  You never felt like you could talk to me?

SPEAKER 2:  I wanted to.  I wasn't sure what you'd do.  I wasn't sure if you'd understand.  I wasn't sure what would happen.  I was afraid.  I'm still afraid.  But I'm glad that it's out in the open.  I really am.  Because part of that that I was hiding inside of me I didn't want you to see, now you see.  That part's okay with me.  But as for what happens next, that's not okay.

SPEAKER 1:  (inaudible)  I can't believe this ever went on and I never saw it.  And you never –

SPEAKER 2:  Your daughters hid it, too.

SPEAKER 1:  -- talked to me about it.  My daughters are daughters.  They're kids.  You're supposed to be an adult.

SPEAKER 2:  Yes.

SPEAKER 1:  I mean, I don't even know if they have a group that you can go to and get help for this.

SPEAKER 2:  Yeah, I bet there is somewhere.  And I believe it's private and confidential too.  Yes, it's a sickness and I let myself go too far, but I've never done it before.  That's why I can't understand.  And it was difficult, so difficult, and all I could think of was you and I've got your daughters running around halfway nude in front of me.  And I told them when they're out playing in the mud in the backyard, take their clothes off before they come in the house, well, they did that, run around in front of God and creation.

SPEAKER 1:  But that makes all the difference in the world, they're kids.  I – I can't even comprehend what would to through your mind to make you want to do something like that.

SPEAKER 2:  I don't know.  Maybe I'm a pervert on the outside.  Maybe there are things about me I don't know.

SPEAKER 1:  Well, I think what I'm gonna have to do, Frank, because I have a lot of feelings, too, here, I have a lot to cope with here, and I don't even want to look at another man.  I don't want to look at – I don't want to see my brothers.  Do you know how bad that feels?  I – love them to death and I'm scared to look at them in the face.  God knows what they're doing.  You hurt me because I trusted you.

SPEAKER 2:  Yes, I hurt you.  But, please, talk to your daughters.  They're a lot –

SPEAKER 1:  (Inaudible.)

SPEAKER 2:  They're smarter than you think.  They're not stupid.  You do have children there.  But they're not like when I was 10 or 11.  Your kids are more aware, before I even came along.

SPEAKER 1:  But you have gone through it and you have gone through puberty and you have gone through all this stuff and you're supposed to know where to draw the line.

SPEAKER 2:  Yeah, a hug and a kiss.  And your daughters hugged me and kissed me every day and told me they loved me, but I couldn't tell them I loved them back because I was afraid of loving anything again, because I'd lose it just like I lost it before.

SPEAKER 1:  Took it away from me.  I hope you enjoyed it because that's all I can say is I – I just – I have been through more shit since I found out about this than I hope to ever go through again.  And – and, Frank, I can't believe you did it.

SPEAKER 2:  I can help.  I'm your enemy.  If you throw away the keys, you're all on your own.

SPEAKER 1:  Who cares?

SPEAKER 2:  I'm the guilty one.

. . . .

SPEAKER 1:  I couldn't trust you, Frank, ever again.  I would always –

SPEAKER 2:  Well, then why don't you just kick me out because it's gonna be hard enough anyway?

SPEAKER 1:  And let you go do this to somebody else because you can't have control?  You need help.  Maybe some –

SPEAKER 2:  Throwing me in jail is not helping me.

. . . .

SPEAKER 2:  Are you gonna call the law on me?

SPEAKER 1:  I probably am, Frank.

SPEAKER 2:  Please don't.

. . . .

SPEAKER 1:  Is there anything else I need to say right now?

SPEAKER 2:  I tried, but I lost it.  And a second chance is not what you're planning on giving because I've already failed [sic] up and this is something you don't get a second chance at.

SPEAKER 1:  (Inaudible.)

SPEAKER 2:  But I took care of your daughters and I made sure they were fed.  And I love your daughters.  I really do.  I loved them because they were my best friends.  And I was lonely when they were gone and I was lonely when you were gone.  I just didn't know where to go.

. . . .

SPEAKER 1:  Okay.  Answer me one question.  How -- how would I ever trust you again?  How -- why would I have you there if I -- I mean, I wouldn't.  There's just the money and I couldn't care about the money.

SPEAKER 2:  You trust me slowly.  You make me earn that trust.  If I have to come to the house to take a shower or to sleep, you be there with your children.  Don't ever leave your kids alone with me until you feel safe or until I feel safe.  All this running away from this is not gonna help.  But if we fix it and we do this thing

right, maybe it will make that little bond stronger.  Because we know we have our faults.

      SPEAKER 1:  I'm going.  Talk to you later, okay?

      (The tape recording playback is concluded).

(*id.* at 276-89).

The prosecution then published the audiotape of the interview between Petitioner and Detective Hughes.[6]  The relevant portion of the interview is as follows:

      DETECTIVE HUGHES:      I'm Detective Chuck Hughes of the Pensacola Police Department.  This is an interview being taken of Robert F. Hayden in reference to case number 99-065086.  We are currently at the Escambia County Jail.  Today is November 4th, 1999, and the time is 5:52 p.m.

      Frank, as I have in the past, it's my duty to advise you of your rights with regards to making a statement.  You have the right to remain silent.  Do you understand that?

      MR. HAYDEN:      Yes.

      DETECTIVE:      Anything you say can be used against you in court.  Do you understand that?

      HAYDEN:      Yes.

      DETECTIVE:      You have the right to talk to a lawyer for advise [sic] before we ask you any questions and have him with you during questioning.  Do you understand that?

      HAYDEN:      Yes.

      DETECTIVE:      If you cannot afford a lawyer, one will be appointed for you free of charge before any questioning if you wish.  Do you understand that?

      HAYDEN:      Yes.

      DETECTIVE:      If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time and you will also have the right to stop answering at any time until you talk to a lawyer.  Do you understand that?

      HAYDEN:      Yes.

      DETECTIVE:      Did you read this paragraph at the bottom of this waiver of rights form?

      HAYDEN:      Yes, I did.

      DETECTIVE:      Do yo understand that paragraph?

      HAYDEN:      Yes.

      DETECTIVE:      Is this your signature at the bottom of this form?

      HAYDEN:      Yes.

---

[6]Defense counsel objected to admissibility of the audiotape, but the objection was overruled (Doc. 12, Ex. B at 103, 231).

DETECTIVE:          Did you witness me signing my name here at the bottom of the form?

HAYDEN:     Yes.

DETECTIVE:          A while ago when we were talking, you were telling me that you realized, you know, what's been going on.  You know in your mind when it started and how it started.  I'd like for you to go ahead and tell me that.

But first, before we get into that, you also told me that you felt that you needed some help.

HAYDEN:     Correct.

DETECTIVE:          Can you tell me about that again?

HAYDEN:     Because of the situation and because it might be something that's like a disease, and I don't want it to happen again.  A little bit is okay, but when it goes on too long, something needs to be done.  Just to throw somebody away and lock the key and have them lose everything over something is stupid.  I'm a valuable person.  I deserve that.  I ask for help.  That's exactly what I want.  Putting me in jail for the rest of my life is no good.

DETECTIVE:          And like I told you a while ago, Frank, I can't promise you anything at all.  And being able to make sure that you get the help that you're asking for, that lies within the court system.

HAYDEN:     I understand that.

DETECTIVE:          Okay.  You told me also that this -- you knew that when this started happening with Amanda and Mary, and it started about, you said, seven to         nine months ago with Amanda?

HAYDEN:     Correct.

DETECTIVE:          Can you -- can you tell me that again?  Start there and tell me.

HAYDEN:     It started when the girls were asking questions about certain things that they had seen before.  They had seen them at a neighbor's house.  When they came back to our house and started acting peculiar, like itching themselves and touching themselves in certain places, that's when it all started.

DETECTIVE:          I hate to interrupt you.  But when you say they saw these at the neighbor's house, did they see the neighbor's doing it or --

HAYDEN:     No.  I know from what their mother has told me that the adult that was in the house at the time had already gone to bed.  The kids stayed up and watched these movies.

DETECTIVE:          Oh, okay.  All right.

HAYDEN:     I don't know how much they seen, but I know that they have seen them.

DETECTIVE:          Go on.

HAYDEN:     What started off as careful play turned into something a lot worse.  When I knew that Amanda first liked what was happening, she enjoyed it.  It wasn't a lot.  It was on occasion, not every week, not even every month, just on occasion.  It started when after Mary would go to bed, we would sit up and watch a

movie, and Mandy would usually come out and sit next to me.  And what started off, like I said, as careful play, just holding each other and sitting there watching a move, turned into rubbing one another.

       DETECTIVE:        You told me earlier that in the beginning you started off with heavy petting and touching on top of the clothes.  And then you said --

       HAYDEN:     Right.

       DETECTIVE:        -- it grew to being under her clothes?

       HAYDEN:     Right.  That's absolutely correct.

       DETECTIVE:        Did she touch you as well on top of your clothes in the beginning?

       HAYDEN:     Yes, she has.

       DETECTIVE:        And then later on under your clothes?

       HAYDEN:     No, I wouldn't let her do that.

       DETECTIVE:        Okay.  But she did touch you on top of your clothes?

       HAYDEN:     She used to rub me all the time, even when she'd come home from school, just to let me know everything was okay, but it wasn't.

       DETECTIVE:        Why is that?

       HAYDEN:     Because she's a young girl.  She doesn't understand.  She thinks she understands, but she don't.  And this is the reason why this was wrong.

       DETECTIVE:        Did you tell her that?

       HAYDEN:     I told her it was wrong and that yes, I would go to jail.

       DETECTIVE:        You also answered her questions about her body.  Would you --

       HAYDEN:     In relation to what she had seen on TV, that is what -- I would tell her what they were doing, and basically that was it.

       DETECTIVE:        Did you show her what they were doing?

       HAYDEN:     I never penetrated.  I never had sex with these girls.  I petted and kissed them.  That's it.

       DETECTIVE:        Okay.  You were also telling me about a strip poker game.  Tell me about that.

       HAYDEN:[7]     This is where the other girl was involved, Mary.  Now, this is just recently, two weeks ago.  We would play like strip poker.  Whoever lost would take their clothes off.  And if they kept on losing and they had their clothes back off, then they had to put them back on.  This would usually last about two hands and then that was it.  The girls would always talk about, okay, the loser's got to do this or the loser's got to do that, but it never happened because I got disgusted and got up to go -- would go have a cup of coffee.

       You really couldn't see anything because I wouldn't turn the lights on.  I left them off.  You had enough light from the bathroom to see the cards and basically that

---

[7]A scrivener's error in the transcript attributes this statement to Detective Hughes (Doc. 12, Ex. B at 295.).

was it.  But like I said, by this time, I was already kind of disgusted with it and didn't want anymore.

The girls enjoyed it, or at least I think they did.  They never stopped.  It's not their fault.  They're not to blame, I am, because I let this happen.  Basically that's it.

DETECTIVE:        You also told me about another game where the girls rode you.

HAYDEN:        They used to sit on my lap even when we were watching TV and sometimes they would straddle me.  And occasionally, like when I'm laying on the bed, Amanda would come in and sit on my stomach and rub back and forth, like wake me up or ride 'em cowboy.

DETECTIVE:        Uh-huh.  Did she have her clothes on at this time?

HAYDEN:        If anything, she had her underwear on.

DETECTIVE:        Just her underwear or --

HAYDEN:        Probably just her underwear.  I've seen the girls nude.  I have asked them to put their -- to take their muddy clothes off when they're out in the backyard, and the next thing I know they're running around in the backyard nude, so, yeah.

DETECTIVE:        Did you have your clothes on when you were doing this?

HAYDEN:        I've had my clothes on all the time except for on occasion where they would -- they would see me nude.  When their bedrooms are across from mine and I'm taking a shower, I'll run right out to the dresser and put my pants on.  So there was always an opportunity because I don't worry about shutting the door.  I want to put my pants on.  So, we try to be careful, but sometimes -- and I don't know if the girl's [sic] are asleep late at night, I don't know what they're doing.

DETECTIVE:        You were also telling me that in the beginning it started out just with the heavy petting and all that stuff.  We're gonna go back to that, where it graduated into other things.  Tell me about what those other things are.

HAYDEN:        It just started by rubbing.  And even Amanda would put my hand down in her crotch because that's what she wanted.  Sometimes I would, sometimes I wouldn't.

DETECTIVE:        You also said that the girls would -- you would catch the girls scratching themselves.

HAYDEN:        In the beginning, that's what I would see.  But I knew that they were playing with themselves.  They only scratched a couple of times.  On occasion, I have seen them playing with themselves.

DETECTIVE:        While they were clothed?

HAYDEN:        Clothed, more or less, yes.  I don't -- like I said, I don't know what happened to them out there.  I know what I've seen.

DETECTIVE:        I understand.  Did you ever try to penetrate the girls with your penis?

HAYDEN:        No, I wouldn't.  I wouldn't come that close.  The girls are too young and too small.  That would never happen.

DETECTIVE:			And did you say that they had seen you nude. Did they ever -- and Amanda had touched you underneath your clothes?

HAYDEN:	I think she might have seen me, but never -- I don't think she's ever touched me.

DETECTIVE:			Okay. Did you ever touch any other part of her body with your penis?

HAYDEN:	If she was sitting on top of me when she came in the bedroom with her underwear on, sometimes she'd land right there.  So -- with clothes on.

DETECTIVE:			But never without any clothes? Never you without any clothes or either one of you?

HAYDEN:	Like I said, they've seen me without clothes before.

DETECTIVE:			But, I mean, sitting on top of you and the riding -- the riding thing.

HAYDEN:	If I didn't have clothes on, I'd probably have the covers on, because I was usually laying in the bed.

DETECTIVE:			Okay.  Did Mary ever see Amanda doing this with you?

HAYDEN:	I don't think so, until we started playing the game about two weeks ago.  And after they would -- they would dare or something, or I'd get tired and go sit on the bed or lay down on the bed and Amanda would hop up there, See, Mary, this is how you ride Frank.  Any they would kind of make a joke out of it.  That's when it started making me sick.  That's why I couldn't do it anymore.  It was too much.  It was going too fast.

DETECTIVE:			Did Mary ever ride you like that, too?

HAYDEN:	Well, she sat on my stomach before.  But Mary is young.  She's not into that.

DETECTIVE:			Okay.  Did --- I'm sorry.

HAYDEN:	If she did sit on my stomach, it wouldn't be for long because that's not right.  I know where she's headed.  I didn't want that anymore.

DETECTIVE:			Where is she headed?

HAYDEN:	She wanted to be just like her sister or just like her mother.  That's wrong.  I couldn't do that.

DETECTIVE:			Did the girls ever see you having sex with their mother?

HAYDEN:	I don't know about that one.  I don't know.  Now -- yeah, we shut the door, I believe.  There's been a lot of times in that bedroom.  And one bedroom is right across from the other, and I'm not sure if that door was shut or if it was opened a little bit.  You might shut that door, but as soon as that air conditioner kicks on, it might blow it right on back opened.  I can't say.  But I know it was dark.  So I don't know.  Their mother is not the blame here.

DETECTIVE:			Oh, I understand that.  I was just wondering if they had ever, you know, seen that.  Because the rooms were across the hall from one another.

HAYDEN:      I don't think Mary would allow that.  And if it did happen, then it probably was an accident.  I know in the past that Mary and her husband were having sex and I do believe Amanda seen it or Mary seen it.  I can't tell you which one.

. . . .

DETECTIVE:            Did the girls ever perform oral sex on you?

HAYDEN:      No.

DETECTIVE:            Did you ever perform oral sex on the girls?

HAYDEN:      As licking them?  Yes, I've licked them.

DETECTIVE:            Both of them?

HAYDEN:      Man, I can't -- I don't think Mary.  Amanda, yes.

DETECTIVE:            How many times have you done that to Amanda do you think?

HAYDEN:      About three or four, probably, that was about as far as it went.

DETECTIVE:            Is that in conjunction with riding -- with the riding game or the card game or --

HAYDEN:      This was before.  This is separate.

DETECTIVE:            All separate, okay.  Tell me about that.  How do you mean before?  Was it like --

HAYDEN:      We started playing the game.  All's I wanted to do was play strip poker because I thought it was funny and that's all.  I didn't mean any harm.  Me licking Amanda started before because of what she had seen, and that's what she asked me about and what it was like.  And I told her what it was like.  I said that's exactly what it's like.  So I showed her.

DETECTIVE:            Did she ask you what anything else was like?

HAYDEN:      She asked me everything, everything she had seen.

DETECTIVE:            Like what?  Tell me what she had seen.

HAYDEN:      Like I don't --

DETECTIVE:            I mean, as far as, you know, what she told you --

HAYDEN:      From the movies that I've seen like late at night, 11:00 or 12 o'clock on Cinemax, they show -- they show this stuff.  It doesn't show pene -- it won't show penetration.  It  shows just the people having sex or something.  They usually have funny names for it.

DETECTIVE:            Uh-huh.

HAYDEN:      If it was anything like that, basically just everything up to -- well, even how baby's [sic] are made, what happens.  The man puts his thing in her thing, okay.

DETECTIVE:            Did she wonder about that, what that felt like?

HAYDEN:      I'm not sure.  I don't know.  Amanda never really let me know about that.

DETECTIVE:            You don't recall --

HAYDEN:      She knows that I know it feels good.  And she knows that sometimes I don't like it.  She also knows it's an expression of a man's love towards

a woman.  She knows that when two people love so -- love one another that's what they do.  And if someone does that with someone else while they're still loving this person, then it's cheating.  I don't know what she thinks about it.

DETECTIVE:          Was Mary as curious as Amanda was about these things?

HAYDEN:     No.  Mary is off in her own little world.

DETECTIVE:          How is that?

HAYDEN:     She gets interested because Amanda gets interested.  She follows her sister.  The mother was never there on the weekends and sometimes during the week she was never there.  So Mary was always the kid and Amanda was the mother.

DETECTIVE:          Did Mary see these movies at the other girl's house or other person's house?

HAYDEN:     I don't know.

DETECTIVE:          Well --

HAYDEN:     I was told by Mary and Amanda's mother that they had seen the movies over there.

DETECTIVE:          That they had seen the movies?

HAYDEN:     Yes.

DETECTIVE:          Indicating both the girls?

HAYDEN:     And she found out because the girls told her I guess.

DETECTIVE:          But Mary never became as inquisitive as Amanda?

HAYDEN:     I don't think she could.  She's just not there.  She's not that way.  Amanda's a lot more grownup than Mary.  I don't know why.  She's just a lot more grownup.  She talks more grownup.  She dresses more grownup.  She acts more grownup.  Her feelings get hurt and she -- she shows it grownup.

DETECTIVE:          Depending on what she had seen in that movie or wherever or if she had accidentally seen you and her mother or her mother and her previous husband or whatever he was, it seems to me that she would have been just as inquisitive about watching it become erect.  Did she ever watch that process happening?

HAYDEN:     She knows it gets hard because she felt that before.  I think she was sitting on the couch one time and I like leaned over and, you know, said, I've got to go take a piss, something like that.  She would notice the difference.

DETECTIVE:          Okay.  But did she ever see it with a rise?  I mean, did she, you know --

HAYDEN:     Like I said, if I'm running around the house and I don't know they're there or they're around or something, yeah, probably.  I can't -- I can't tell you, though.

DETECTIVE:          Okay.  During these times that you had either/or, either you while you were licking Amanda or playing a game, the riding game or the card game or anything like that, do you know if on any one of those occasions she saw you become erect?

HAYDEN:        No, I don't think so.  That didn't turn me on too much.  Most of the time I was sitting there like in Indian style on the floor, you know?

DETECTIVE:        And do you think -- or did she ever mention the fact --

HAYDEN:        There's something you need to know.  I never lost the game.  Mary and Amanda lost the game.  Most of the time, I'm sitting there just like I'm sitting here.

DETECTIVE:        Uh-huh.  Did she ever either indicate that she had seen you or maybe someone on the movie, a man, ejaculate?  Did she ever become inquisitive about that?

HAYDEN:        I'm not sure if she knows about that.

DETECTIVE:        Did you show her about that?

HAYDEN:        No.

DETECTIVE:        Has she ever questioned you about that part?

HAYDEN:        She questioned about how babies are and she know about sperm.  It's called the seed.  And she knows about the egg.  And when the seed meets the egg, then that's how a baby is born.

DETECTIVE:        You don't think she's ever seen it?

HAYDEN:        No.  I don't know.  I don't know what they watched over there.  I know that on ours, they don't -- they don't show that.

DETECTIVE:        Right.  But from you yourself?

HAYDEN:        No.  If I creamed in my pants, I had my underwear on and I'd go wash it off.

DETECTIVE:        Did you ever do that while you were doing this with the girls?

HAYDEN:        No, I couldn't go that far.  The way that it was at that house, working and paying the bills, a lot of times I didn't have that on my mind.  Sometimes big Mary even had to get me excited so I would help her out when her stress level got too high or something like that.  It was a mess.

DETECTIVE:        Well, you told me that this started about nine months ago with Amanda first, and recently with Mary.  Over that nine month period of time, how many times do you think you've done this with Mary?

HAYDEN:        Oh, like I said, in the beginning, it was once a month, once every two months.  But recently like right before we started playing the game, she would -- like every Friday night she'd want -- you know, she'd be that close to me.  You can tell.  It's not like she's running away from me or hiding.  And then that's -- I'd get tired on the weekend and want to send them over to their parents -- or the grandparent's house.  The girls didn't like that.  It gave me a break.

DETECTIVE:        So what about with Mary, how long ago did that start with Mary?

HAYDEN:        Like I said, probably about a couple of weeks.  But Mary -- Mary didn't do anything.  Mary's innocent.  She probably knows as much as Amanda has told her.  Her and Amanda I know -- because Amanda -- no, Mary told me that they used to play boy and girl.  This is a long time ago.  Mary would get on

Amanda or Amanda would get on Mary.  I'm not sure where it came from.  But I know -- I know that that's -- that's what she told me.

DETECTIVE:            In these movies, I'm sure they've seen these women's breast exposed.

HAYDEN:      Right.

DETECTIVE:            Did Amanda show any indications of -- questions about that?

HAYDEN:      She knows what breasts are and she knows she hasn't got any.  And she knows it's right about time for her to start developing.

DETECTIVE:            Did you teach her about that as well?

HAYDEN:      I told her that she'll have some breasts some day.  She's a girl.  She -- a girl grows into a woman.  And she's ten years old.  Hell, I've seen nine year old's out there with breasts.  I don't -- I can't tell you when they're going to grow.  All I know is, yes, she'll have a figure like that some day.

DETECTIVE:            Did you ever --

HAYDEN:      Of course, she would know that.  She knows she grows up.

DETECTIVE:            I was just wondering about how inquisitive she got, she became about that.  If she saw like in the movie, a man touching a woman's breast, like they do in some of the movies sometimes, would she want you to do that as well so she could see how that felt, too?

HAYDEN:      I'd rub her belly a lot.  That was about it.

DETECTIVE:            That's what I was --

HAYDEN:      I wasn't into Amanda (inaudible) huh-uh.

DETECTIVE:            Is there anything else that we haven't -- that you can think of we haven't covered, we haven't been over?  Anything else you want me to know or something I'm not asking or something?

HAYDEN:      Help.

DETECTIVE:            I understand that.

HAYDEN:      I don't know.  I don't know what else to tell you.  You understand my feelings.  You understand my wrongdoing.

DETECTIVE:            Did you ever take the girls' clothes off or did they take their clothes off?

HAYDEN:      They would.

DETECTIVE:            But you never --

HAYDEN:      They would -- well, comes [sic] in soaking wet, yeah, I'll help you pull your shirt off.

DETECTIVE:            Yeah, but I mean, when you were either playing the game or did the rubbing part, not so much when you were (inaudible) --

HAYDEN:      No, they would.  That was the fun part.  Okay, you gotta take your shirt off.  So she'd take her shirt off.

DETECTIVE:            So you would tell her to take her shirt off?

HAYDEN:      No, they lost in the poker hand, they gotta take their shirt off.

> DETECTIVE:            Oh, I see.  Did you ever force either one of the girls to play this, to do this?
>
> HAYDEN:      No.  No, I didn't force them to do anything.  And that's the point I'm trying to make, no.  I told them I would never hurt them, but I did.
>
> DETECTIVE:           I think that's about --
>
> HAYDEN:      They don't know, that's why.  Even if they were 14 and 15 years old, sure, it's against the law, but by that time the girl already knows.  And if you do it against her will, then it's called rape.  And even at nine and ten years old, you do it against their will, it's called rape.
>
> DETECTIVE:            Did the girls ever indicate to you that they were doing -- that you were doing this against their will or maybe they pushed you away or they didn't want to --
>
> HAYDEN:      No, they would just say, Oh, Frank you're being a bad boy.
>
> DETECTIVE:            When did they say that?  I mean, what was going on when they would say that?
>
> HAYDEN:      I'd come up from behind them and hug them, pick them up, oh, you're being a bad boy.
>
> DETECTIVE:            Anything else you can think of?
>
> HAYDEN:      No.  I think I've said enough to incriminate myself.
>
> DETECTIVE:            This statement is being ended at 6:16 p.m. on the 14th -- on the 4th of November.
>
> (Tape recording playback concluded.)

(*id.* at 289-313).

The prosecution and defense rested.  Petitioner's counsel moved for a judgment of acquittal on all counts, and the motion was denied (*id.* at 327-30).  After deliberating approximately five hours, the jury found Petitioner guilty of three counts of sexual battery upon a victim less than 12 years of age by a person over 18 years of age, one count of battery, one count of lewd and lascivious molestation, and one count of lewd and lascivious assault (*id.* at 431-33).  Upon discharge of the jury and following a bench conference with counsel, the trial court inquired of Petitioner whether he understood that there was a mandatory life sentence, and Petitioner responded affirmatively (*id.* at 435).  The court provided defense counsel and Petitioner an opportunity to speak before imposition of sentence, but Petitioner and his counsel stated they had nothing to say (*id.*).  The court then sentenced Petitioner (*id.* at 435-437).

III.    STANDARD OF REVIEW

Section 2254(a) of Title 28 provides, "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on

the ground that he is in custody in violation of the Constitution or laws of the United States." As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for federal habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA). Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19.

Section 2254 now provides:

(d)     An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
   (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
   (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254 (West Supp. 2001).

The United States Supreme Court explained the framework of review under § 2254(d)(1) in Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).[8] The appropriate test in habeas cases was described by Justice O'Connor as follows:

In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied - the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially

_____

[8]Unless otherwise noted, references to Williams are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367-375, 390-399, 120 S.Ct. at 1499-1503, 1511-1516); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and —except as to the footnote – Scalia) in part II (529 U.S. at 403-413, 120 S.Ct. at 1518-1523). The opinion of Justice Stevens in Part II was joined by Souter, Ginsburg, and Breyer.

indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412-13; Ramdass v. Angelone, 530 U.S. 156, 120 S.Ct. 2113, 2119-20, 147 L.Ed.2d 125 (2000).

In deciding whether a state court decision involved "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding" under § 2254(d)(2), determinations of fact are "presumed to be correct," unless the presumption is rebutted by Petitioner "by clear and convincing evidence." § 2254(e)(1); *see* Miller-El v. Cockrell, 537 U.S. 322, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003); Fugate v. Head, 261 F.3d 1206, 1215 (11th Cir. 2001), *cert. denied*, 535 U.S. 1104, 122 S.Ct. 2310, 152 L.Ed.2d 1065 (2002) (quoting 28 U.S.C. § 2254(e)(1)); Parker v. Head, 244 F.3d 831, 835-36 (11th Cir. 2001) (citing § 2254(d)(2) and (e)(1)); *see also* Crawford v. Head, 311 F.3d 1288 (11th Cir. 2002) (explaining that the new statute provides a "highly deferential standard of review" of the state court's factual determinations). Although Williams set forth the Supreme Court's interpretation of § 2254(d)(1), not § 2254(d)(2), the Court subsequently enunciated the § 2254(d)(2) standard:

Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2); see also Williams, 529 U.S. at 399, 120 S.Ct. 1495 (opinion of O'CONNOR, J.).

Miller-El, 537 U.S. 322, 123 S.Ct. at 1041 (dicta).

The Eleventh Circuit has developed a three-step process for applying the Williams test to any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal state court proceeding. *See* Wellington v. Moore, 314 F.3d 1256, 1260-61 (11th Cir. 2002); Robinson v. Moore, 300 F.3d 1320, 1343-45 (11th Cir. 2002). First, the court must ascertain the controlling legal principles that are clearly established by the Supreme Court at the time of the state court adjudication. Wellington, 314 F.3d at 1260; Robinson, 300 F.3d at 1343. Second, the court must determine whether the state court adjudication was contrary to the clearly established Supreme

Court law.  Wellington, 314 F.3d at 1260, Robinson, 300 F.3d at 1344.  "The 'contrary to' clause in § 2254(d)(1) 'suggests that the state court's decision must be substantially different' from the relevant Supreme Court precedent."  Wellington, 314 F.3d at 1260 (quoting Fugate, 261 F.3d at 1216 (quoting Williams, 529 U.S. at 405)).  "Although a state court's decision that 'applies a rule that contradicts' the governing Supreme Court law is 'contrary,' a state court decision that applies 'the correct legal rule' based on Supreme Court law to the facts of the petitioner's case would not fit within the 'contrary to' clause even if the federal court might have reached a different result relying on the same law."  Wellington, 314 F.3d at 1260 (citing and quoting Williams, 529 U.S. at 404-04).  If the state court applied the correct Supreme Court precedent, and the United States Supreme Court, faced with materially indistinguishable facts, has not reached a decision different from the decision reached by the state court in the petitioner's case, the case does not fit within the "contrary to" clause, and the federal habeas court must proceed to the third step and determine whether the state court "unreasonably applied the relevant Supreme Court authority."  Fugate, 261 F.3d at 1216.  Likewise, if the facts of the Supreme Court cases and the petitioner's case are not substantially similar, "a state court decision that applies 'the correct legal rule' based on Supreme Court law to the facts of the petitioner's case would not fit within the 'contrary to' clause even if the federal court might have reached a different result relying on the same law."  Id. (citing and quoting Williams, 529 U.S. at 406).  A state court is not required to cite Supreme Court cases or even be aware of the cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them."  Early v. Packer, 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002).

The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable."  Williams, 529 U.S. at 410.  The Supreme Court has explained that "a federal habeas court may not issue a writ under the unreasonable application clause 'simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'"  Bell v. Cone, 535 U.S. 685, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002) (quoting Williams, 529 U.S. at 411).  Indeed, "[t]he gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."  Lockyer v. Andrade, 538 U.S. 63, 123 S.Ct. 1166, 1175, 155 L.Ed.2d 144 (2003).  A state court's incorrect application of clearly

established law will be held to be reasonable and not warrant a writ unless "thorough analysis by a federal court produces a firm conviction that that [the state court] judgment is infected by constitutional error." Williams, 529 U.S. at 389.  "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations." Yarborough v. Alvarado, 541 U.S. 652, 124 S.Ct. 2140, 2149, 158 L.Ed.2d 938 (2004) (citation omitted).  Although § 2254(d)(1) is concerned only with federal law as clearly established by the Supreme Court, this Court may look to circuit precedent to demonstrate reasonable applications of Supreme Court precedent. Van Poyck v. Fla. Dep't of Corrections, 290 F.3d 1318, 1322 n. 4 (11th Cir. 2002).

IV.    EXHAUSTION AND DEFAULT

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner have exhausted available state court remedies, 28 U.S.C. § 2254(b)(1),[9] thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." Duncan v. Henry, 513 U.S. 364, 365, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)).  To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim.  Duncan, 513 U.S. at 365-66; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); Picard, 404 U.S. at 277-78.

_____

[9]Section 2254 provides, in pertinent part:

(b)(1)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–

(A)  the applicant has exhausted the remedies available in the courts of the State; or

(B) (i)  there is an absence of available State corrective process; or

(ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

The Supreme Court has offered the following guidance for determining whether a habeas petitioner has met the "fair presentation" requirement.  In Picard v. Connor, 404 U.S. 270, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief.  In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," id. at 278, 92 S.Ct. at 513, the Court rejected the contention that the petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

Additionally, the Court has indicated that it is insufficient to make a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court.  In Anderson v. Harless, 459 U.S. 4, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982), the habeas petitioner was granted relief on the ground that a jury instruction violated due process because it obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt.  Id. 459 U.S. at 7, 103 S.Ct. at 278 (citing Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979)).  The only manner in which the habeas petitioner cited federal authority was by referring to a state court decision in which "the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law."  Anderson, 459 U.S. at 7, 103 S.Ct. at 278 (internal quotation marks omitted).  The Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law was sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the cited case advanced a federal claim.  Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought.  Id., 459 U.S. at 7 and n. 3, 103 S.Ct. at 278 and n. 3.

Years later, the Supreme Court readdressed the "fair presentation" requirement in Duncan v. Henry, 513 U.S. 364.  The Duncan Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, the petitioner must raise his issue in terms of the applicable federal right in state court in order

to obtain federal review of the issue.[10]  The Supreme Court explained, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court."  <u>Duncan</u>, 115 S.Ct. at 888.  Very recently, the Supreme Court again focused upon the requirement of "fair presentation," holding that  "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so."  <u>Baldwin v. Reese</u>, 541 U.S. 27, 124 S.Ct. 1347, 1351, 158 L.Ed.2d 64 (2004).  The <u>Baldwin</u> Court commented that "a litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'"  <i>Id.</i>

Prior to <u>Duncan</u>, the Eleventh Circuit broadly interpreted the "fair presentation" requirement.  <i>See, e.g.</i>, <u>Watson v. Dugger</u>, 945 F.2d 367 (11th Cir. 1991) (finding issue to be exhausted when petitioner argued in state court that trial court had failed to follow state law which required proof of all elements of the crime, and argued in federal court that this was a due process violation); <u>Mattox v. Dugger</u>, 839 F.2d 1523 (11th Cir. 1988) (holding that a federal habeas corpus petition should not be dismissed on grounds of procedural default when a petitioner has previously brought an issue before a state court alleging only state law violations, when such a claim is equally supported by federal law, and the state cites such federal law in support of its position).  However, after <u>Duncan</u>, the Eleventh Circuit has taken a more restrictive approach.  For example, in <u>Zeigler v. Crosby</u>, the Circuit Court held that the habeas petitioner failed to "fairly present" his juror misconduct claims to the state courts where his brief to the state appellate court did not refer to the federal constitutional issues raised in his federal habeas petition, and none of the cases cited in his direct appeal discussed the Federal Constitution.  345 F.3d 1300, 1307 (11th Cir. 2003).  The court specifically noted that the section of the petitioner's appellate brief which dealt with juror

---

[10]The petitioner in <u>Duncan</u> raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal.  Presented with a state constitutional claim, the state court applied state law in resolving the appeal.

misconduct contained the words: "Appellant was denied due process and a fair trial. . . .," which could be interpreted as asserting a fair trial claim under the Florida Constitution and Florida's Due Process Clause. *Id.* at 1308 n.5. The only cases cited in the discussion of the issue in petitioner's state appellate brief were state supreme court cases that made no mention of the United States Constitution and cited no federal cases. The court concluded that petitioner's "[c]ursory and conclusional sentence (unaccompanied by citations to federal law), . . . did not present to the Florida courts the federal claim asserted to us." *Id.*

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, i.e., procedurally barred from federal review. O'Sullivan, 526 U.S. at 839-40, 848, 119 S.Ct. at 1734. This Court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default. *See* Coleman v. Thompson, 501 U.S. 722, 734-35 and n.1, 111 S.Ct. 2546, 2555, 115 L.Ed.2d 640 (1991); Caniff v. Moore, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); Chambers v. Thompson, 150 F.3d 1324, 1326-27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord* Tower v. Phillips, 7 F.3d 206, 210 (11th Cir. 1993); Parker v. Dugger, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L.Ed.2d 812 (1991). However, a petitioner may obtain federal review of his claim if the state procedural rule is applied in an "arbitrary or unprecedented fashion," Judd v. Haley, 250 F.3d 1308,1313 (11th Cir. 2001), or in a manifestly unfair manner. Ford v. Georgia, 498 U.S. 411, 424-25, 111 S.Ct. 850, 858, 112 L.Ed.2d 935 (1991); Upshaw v. Singletary, 70 F.3d 576, 579 (11th Cir. 1995).

To overcome a procedural default, the petitioner must show cause and prejudice or a fundamental miscarriage of justice in order for the federal habeas court to reach the merits of a claim. Tower, 7 F.3d at 210; Parker, 876 F.2d 1470. "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim." McCleskey v. Zant, 499 U.S. 467, 497, 111 S. Ct. 1454, 1472, 113 L. Ed. 2d 517 (1991) (quoting Murray v. Carrier, 477 U.S. 478, 488,

106 S. Ct. 2639, 2645, 91 L.Ed.2d 397 (1986)).  Lack of counsel or ignorance of available procedures is not enough to establish cause.  Tower, 7 F.3d at 211.  To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent."  Schlup v. Delo, 513 U.S. 298, 327, 115 S.Ct. 85, 130 L.Ed.2d 808 (1995).  "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him."  Schlup, 513 U.S. at 327. Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare.  To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial.

Id.

Within this framework, this Court will review Petitioner's claims.

V.      PETITIONER'S CLAIMS

A.      Ground One:   "Denial of Effective Assistance of Counsel"

Petitioner claims his counsel performed in a constitutionally deficient manner by failing to seek suppression of his statements to Mary Anne Mortimer on the ground that they were involuntary because they were induced by Ms. Mortimer's promises that the statements would be confidential and not reported to police (Doc. 1 at 5-5b).  Petitioner states Ms. Mortimer's promises induced him to subsequently confess to the police because "the cat was already out of the bag" (id. at 5c).  He argues he suffered prejudice as a result of counsel's failure because it is reasonably probable the trial court would have suppressed his statements to Ms. Mortimer as well as his confession to police (id.).

Respondent concedes this issue was exhausted in the state courts (Doc. 10 at 5).

1.      Clearly Established Supreme Court Law

The legal standard clearly established by the Supreme Court for ineffectiveness of counsel claims is set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  See Fugate v. Head, 261 F.3d 1206, 1216-17 (11th Cir. 2001); Wellington v. Moore, 314 F.3d 1256,  1260 (11th Cir. 2002) (both citing Williams v. Taylor and Strickland).  The two components of an ineffectiveness claim under Strickland are performance and prejudice, and if an

insufficient showing is made as to one, the court need not address the other.  Strickland, 466 U.S. at 697, 104 S.Ct. at 2069; Wellington, 314 F.3d at 1260.  In assessing performance, the court considers whether "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  466 U.S. at 686, 104 S.Ct. at 2064.  "The court must . . . determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance."  466 U.S. at 690, 104 S.Ct. at 2066. Petitioner must show that "no competent counsel would have taken the action that his counsel did take."  Fugate, 261 F.3d at 1217 (citation omitted).

To establish ineffective assistance, Petitioner must provide factual support for his contentions regarding counsel's performance.  Smith v. White, 815 F.2d 1401, 1406-07 (11th Cir. 1987).  Bare, conclusory allegations are insufficient.  Tejada v. Dugger, 941 F.2d 1551, 1559 (11th Cir. 1991). Furthermore, "[a]n ambiguous or silent record is not sufficient to disprove the strong and continuing presumption . . . that [counsel] did what he should have done and that he exercised reasonable professional judgment."  Chandler v. United States, 218 F.3d 1305, 1314 n.15 (11th Cir. 2000) (en banc) cert. denied, 121 S.Ct. 1217, 149 L.Ed.2d 129 (2001).

> Trying cases is no exact science.  And as a result, we must never delude ourselves that the fair review of a trial lawyer's judgment and performance is an activity that calls for great precision or for a categorical approach.  When reviewing whether an attorney is ineffective, courts "should always presume strongly that counsel's performance was reasonable and adequate."  Atkins v. Singletary, 965 F. 2d 952, 958 (11th Cir. 1992).  And, "a court should be highly deferential to those choices . . . that are arguably dictated by a reasonable trial strategy."  Devier v. Zant, 3 F.3d 1445, 1450 (11th Cir. 1993).  Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it can be shown that no reasonable lawyer, in the circumstances, would have done so.

Rogers v. Zant, 13 F. 3d 384, 386 (11th Cir. 1994); see also Grayson v. Thompson, 257 F.3d 1194, 1216 (11th Cir. 2001) (to show counsel's performance was unreasonable, defendant must establish that no competent counsel would have taken the action that his counsel did take); Chandler, 218 F.3d at 1313 (issue is not what is possible, prudent, or appropriate, but what is constitutionally compelled) (citing Burger v. Kemp, 483 U.S. 776, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987)).

As stated by the Eleventh Circuit:

> No absolute rules dictate what is reasonable performance for lawyers. [citing Strickland, 104 S.Ct. at 2065; other citations omitted]. "Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." Strickland, 104 S.Ct. at 2065; [other citations omitted]. The law must allow for bold and for innovative approaches by trial lawyers. And, the Sixth Amendment is not meant "to improve the quality of legal representation," but "simply to ensure that criminal defendants receive a fair trial." Strickland, 104 S.Ct. at 2065.

Chandler, 218 F.3d at 1307. However, not every strategic decision passes constitutional muster. Whether a particular decision by counsel was a tactical one is a question of fact, Hardwick v. Crosby, 320 F.3d 1127, 1163 (11th Cir. 2003), and the state court's resolution of that issue enjoys a strong presumption of correctness. *See* 28 U.S.C. § 2254(e)(1); Jackson v. Herring, 42 F.3d 1350, 1367 (11th Cir. 1995); Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir. 1991). Whether a particular tactical decision was a reasonable one, however, is a question of law, Hardwick 320 F.3d at 1163; Jackson, 42 F.3d at 1367; Horton, 941 F.2d at 1462. In determining whether counsel's decision was reasonable, "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S.Ct. at 2065.

As to the prejudice prong of the Strickland standard, Petitioner's burden of demonstrating prejudice is high. Wellington, 314 F.3d at 1260. The Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Id.* (quoting Strickland, 466 U.S. at 693, 104 S.Ct. at 2067). However, the Court has also clarified that a petitioner need not demonstrate it 'more likely than not, or prove by a preponderance of evidence,' that counsel's errors affected the outcome. Strickland, 466 U.S. at 693-94, 104 S.Ct. at 2068. Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 694, 104 S.Ct. at 2068. Indeed, it would be "contrary to" the law clearly established in Strickland for a state court to reject an ineffectiveness claim for failing to prove prejudice by a preponderance of the evidence. Williams v. Taylor, 529 U.S. at 405-406, 120 S.Ct. at 1519.

The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. Strickland, 466 U.S. at 694-95, 104 S.Ct. at 2068.  "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  *Id.* at 695, 104 S.Ct. at 2068-69.

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.  Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways.  Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect.  Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.  Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors. . . . [T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged.

*Id.* at 695-96, 104 S.Ct. at 2069.

2.      Federal Review of State Court Decision

Citing portions of the trial transcript, the state court found that Petitioner's counsel filed a motion to suppress both the audiotape of Petitioner's conversation with Mary Anne Mortimer and Petitioner's confession to police on the ground that Ms. Mortimer was acting as an agent of the State to obtain a confession by Petitioner, and the resulting confession was involuntary because Petitioner had not been advised of his rights under Miranda[11](Doc. 12, Ex. H at 65, 90-93).  The state court found that the trial court denied the motion to suppress upon concluding that Ms. Mortimer was not acting as an agent for the State, and the taping of the conversation was permissible under the Florida wiretap statutes, therefore, the audiotape of Petitioner's conversation with Ms. Mortimer was admissible, and Petitioner's confession to police was knowing and voluntary (*id.*).  Additionally, the state court found that even if Petitioner's counsel would have raised the specific argument for suppression raised by Petitioner, the trial court would still have denied the motion because some

_____

[11]Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

type of police conduct causally related to the confession is required to warrant suppression (*id.* at 66). In analyzing Petitioner's claim, the state court applied the <u>Strickland</u> standard and concluded Petitioner's claim was without merit (*id*).

Because the state court applied the correct Supreme Court precedent, Petitioner is entitled to habeas relief only if he establishes the state court's denial of his claim was objectively unreasonable. For the trial court to grant the motion to suppress on the ground that Ms. Mortimer induced the incriminating statements with promises that she would not go to the police, Petitioner would have to establish Ms. Mortimer was acting as an agent of the State. At the suppression hearing, Petitioner's counsel made this argument, and it was explicitly rejected by the trial court (*see* Doc. 12, Ex. H at 92-93). Thus, Petitioner has failed to show a reasonable probability that the trial court would have granted the motion to suppress if counsel had argued Petitioner's statements were involuntary because they were induced by promises that Ms. Mortimer would not go to the police. Accordingly, the state court's denial of this ineffective assistance claim was not unreasonable.

Additionally in Ground One Petitioner complains of the following "cumulative errors" by counsel: (1) failure to object to admission of the videotaped interviews of Mary and Amanda Mortimer by Brandy Strahan on the ground that the children's statements on the tape were inaudible; (2) failure to seek to disqualify Ms. Strahan as a witness on the ground that she did not perceive or remember the material facts to which she testified; (3) failure to impeach Ms. Strahan on the ground that she was not competent to testify to the facts to which she testified, and as a representative of the State, Ms. Strahan had an interest in the outcome of trial; (4) failure to object to or impeach Mary Mortimer's testimony that she observed Petitioner sexually abuse her sister on the ground that the videotaped statements and live testimony were inconsistent; (5) failure to object to admission of Amanda Mortimer's hearsay statements to Mary Anne Mortimer and Brandy Strahan on the ground that there was insufficient corroborating evidence to support admission of the hearsay statements, and (6) failure to move for a mistrial in light of the erroneous admission of the hearsay statements (*id.* at 5c-5i).

In a footnote, the state court addressed the additional claims as follows:

> To the extent the Defendant's grounds one thru nine contain allegations of ineffective assistance of counsel not specifically addressed in this order, the claims

> are legally insufficient.  See <u>Kennedy v. State</u>, 547 So.2d 912, 913 (Fla. 1989) (holding that a facially sufficient 3.850 motion must allege "specific facts, that when considering the totality of the circumstances, are not conclusively rebutted by the record and that demonstrate a deficiency on the part of counsel which is detrimental to the defendants."). For example, the Defendant's ground one alleges the argument addressed above, plus at least seven additional allegations of ineffective assistance of counsel. See Defendant's motion, p. 5(c) - 5(h) & Defendant's memorandum, p. 6-10.

(Doc. 12, Ex. H at 64).  The state court's decision that Petitioner's additional claims were legally insufficient, was based on a state law ground that is independent of federal law and adequate to support the judgment.  Furthermore, the state court fairly and correctly applied the procedural bar, therefore, a procedural default has resulted barring federal habeas review.  *See* <u>Coleman</u>, 501 U.S. at 729, 111 S.Ct. at 2554; <u>Wainwright</u>, 433 U.S. at 80, 97 S.Ct. at 2503-07; <u>Harmon</u>, 894 F.2d 1268, 1270 (11th Cir. 1990) (citing <u>Wainwright</u>).  Moreover, Petitioner has failed to show cause for and actual prejudice from his failure to present his additional claims in a facially sufficient manner in his Rule 3.850 motion, or that a fundamental miscarriage of justice will result from this Court's failure to address the claims.  Therefore, Petitioner is not entitled to federal habeas review of his additional claims of ineffective assistance of counsel mentioned in his discussion of Ground One.

B.     Ground Two:  "Denial of Effective Assistance of Counsel"

Petitioner claims his counsel performed in a constitutionally deficient manner by failing to move to dismiss count three of the fourth amended information, which charged Petitioner with capital sexual battery of Amanda Mortimer, on the ground that the information failed to sufficiently charge sexual battery because the union of Petitioner's sexual organ with Amanda Mortimer's vulva is not sexual battery as defined by Florida Statutes section 794.011 (*see* Doc. 1 at 6 - 6a). Additionally, Petitioner argues his counsel failed to object to the jury instruction and verdict form, and failed to move for a mistrial on Count Three on the ground that the amended information did not charge him with union of his sexual organ with Amanda's vagina, rather, it charged him with union of his sexual organ with Amanda's sexual organ, and the evidence showed only the union of his sexual organ with Amanda's vulva (*id.* at 6b - 6c).

Respondent concedes this issue was exhausted in the state courts (Doc. 10 at 12).

1.     <u>Clearly Established Supreme Court Law</u>

The Supreme Court law governing claims of ineffective assistance of counsel was set forth *supra*.

2.     <u>Federal Review of State Court Decision</u>

The state court denied Petitioner's claim on the ground that the information properly charged capital sexual battery according to state law, specifically, Florida Statutes sections 794.011(1)(b) and 794.011(2)(a) and <u>Bowden v. State</u>, 642 So.2d 769 (Fla. 1st DCA 1994), thus a motion to dismiss Count Three would have been denied (Doc. 12, Ex. H at 66-67).

The fourth amended information charged Count Three as follows:

> . . . **ROBERT FRANKLIN HAYDEN, between August 01, 1998 and November 04, 1999**, at and in Escambia County, Florida, being then eighteen (18) years of age or older, to-wit: **36 or 37** years of age did unlawfully commit a sexual battery upon a person less than twelve years of age, to-wit: **Amanda Mortimer, 9 or 10** years of age **(born 10/10/89)**, by **union of his sexual organ with the sexual organ of Amanda Mortimer**, in violation of Section 794.011(2)(a), Florida Statutes.

(Doc. 12, Ex. H, attached Fourth Amended Information).  Sexual battery is defined as "oral, anal, or vaginal penetration by, or union with, the sexual organ of another or the anal or vaginal penetration of another by any other object; however, sexual battery does not include an act done for a bona fide medical purpose."  FLA. STAT. § 794.011(1)(b) (1999).  Florida statutes further provide that a person who is eighteen years of age or older who commits sexual battery on a victim under the age of twelve years of age commits a capital felony.  FLA. STAT. § 794.011(2)(a) (1999).  Controlling legal precedent in the First DCA, the jurisdiction in which the trial court was located, at the time of Petitioner's trial established:

> . . . although the term "vagina," may have a very definite medical meaning, the word as used in the statute is a term of art, which connotes "a female's private parts." Thus, where the male offender is charged with committing sexual battery by penile union or penetration, the statute is broad enough to contain within its prohibition penetration or union with the female victim's sexual organ.

<u>Bowden v. State</u>, 642 So.2d 769, 771 (Fla. 1st DCA 1994).

Thus, the fourth amended information sufficiently charged Petitioner with capital sexual battery, as the language "sexual organ" was necessarily within the definition of "vagina" as the term is used in the sexual battery statute.  Therefore, Petitioner has failed to show a reasonable probability the trial court would have granted a motion to dismiss or sustained an objection to the jury

instruction or verdict form if counsel had made such objections.  Furthermore, Petitioner admits the evidence showed the union of his sexual organ with Amanda's vulva; therefore, there is no reasonable probability a motion for mistrial would have been granted.  Accordingly, the state court's denial of Petitioner's ineffective assistance claim was reasonable.

      C.     Ground Three:  "Lack of jurisdiction of the Court to enter judgment and sentence for first degree felony as to Count Five."

Petitioner claims the trial court lacked jurisdiction to convict and sentence him on Count Five, lewd and lascivious molestation by a person 18 years of age or older, on the ground that the jury did not specifically find that Petitioner was 18 years of age or older, and the trial court did not instruct the jury that they must find that Petitioner was over 18 years of age in order to convict him of a first degree felony under Florida Statutes section 800.04(b).

Respondent contends that although Petitioner raised the issue of the lack of jury instruction as to his age in his Rule 3.850 motion, he did not fairly present the issue of the trial's court's jurisdiction to sentence him (Doc. 10 at 18).  Furthermore, the jurisdictional issue should have been properly raised on direct appeal (*id.*).

      1.     Clearly Established Supreme Court Law

Petitioner essentially makes an Apprendi v. New Jersey argument, namely, that a fact that increases a defendant's sentence beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt.  530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). The "statutory maximum" for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.  *See* Blakely v. Washington, __ U.S. __,124 S.Ct. 2531, 2537, 150 L.Ed.2d 403 (2004).  However, Apprendi errors are not jurisdictional or structural, rather they are subject to harmless error analysis.  *See* United States v. Anderson, 289 F.3d 1321, 1326 (11th Cir. 2002).  "[A] constitutional error is harmless if 'it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'"  United States v. Nealy, 232 F.3d 825, 829 (11th Cir. 2000).

      2.     Federal Review of State Court Decision

Contrary to Respondent's position, Petitioner fairly presented the jurisdictional issue as Ground Three in his Rule 3.850 motion (*see* Doc. 12, Ex. G at 15, 19-20).  The state court analyzed

the claim as a claim of ineffective assistance of counsel for counsel's failure to object to the jury instruction on the lewd and lascivious molestation count or request a special jury instruction (*see* Doc. 12, Ex. H at 69).   The state court determined that the trial court gave the standard jury instruction, therefore, Petitioner's counsel was not ineffective for failing to object or request a special instruction (*id.*).  Because the state court did not address the jurisdictional issue, this Court will review the claim de novo.

As discussed *supra*, the Eleventh Circuit has interpreted Apprendi as defining sentencing errors as non-jurisdictional.  Therefore, Petitioner's claim that the trial court lacked jurisdiction to sentence him because the issue of his age was not presented to the jury for determination is without merit.   Additionally, no Apprendi error occurred, as Petitioner was not sentenced beyond the prescribed statutory maximum, and the fact (i.e., his age) that increased the degree of his offense from a second degree felony to a first degree felony (*see* FLA. STAT. § 800.04), was charged in the information and reflected in the jury verdict.[12]  Furthermore, even if an Apprendi error occurred, it certainly was harmless here, where Petitioner's age was never disputed and the prosecution established he was indeed over the age of eighteen at the time of the offenses.[13]   To the extent Petitioner challenges his conviction on the ground that his age was an essential element of the offense, his claim is without merit, as the age of the defendant is not an element of the crime of lewd and lascivious molestation, it merely establishes the degree of the offense.  *See* Desbonnes v. State, 846 So.2d 565 (Fla. 4th DCA 2003); FLA. STAT. § 800.04.  Similarly, to the extent Petitioner claims that insufficient evidence exists to support a conviction on Count Five because his age was not established, his claim is without merit, as noted *supra*.

D.      Ground Four:  "Denial of Effective Assistance of Counsel"

Petitioner next presents four claims of ineffective assistance of counsel with regard to Count Six:  (1) failure to move to dismiss Count Six on the ground that the charge was "improperly

---

[12] The fourth amended information charges in Count Five that Petitioner, "while being 18 years of age or older, to wit: 36 or 37 years of age, did unlawfully . . . " (Doc. 12, Ex. H at 98), and the jury verdict as to Count Five states that "[Petitioner] is Guilty of Lewd and Lascivious Molestation, as charged" (Doc. 12, Ex. A).

[13] Mary Anne Mortimer testified that Petitioner was thirty-seven years old at the time of the trial (Doc. 12, Ex. B at 174) and the trial occurred within three years of the alleged assaults (*see* Doc. 12, Ex. B at 1, Ex. H at 97-98).

duplicitous;" (2) failure to move for judgment of acquittal on the ground that there was insufficient evidence to support a conviction for lewd and lascivious assault, (3) failure to move for new trial as to Count Six on the ground that the verdict was contrary to the law or the weight of the evidence, and (4) failure to object to the trial court's sentencing Petitioner immediately after conclusion of the trial (Doc. 1 at 6, 6f - 6h).

Respondent concedes Petitioner exhausted his claims in the state courts (Doc. 10 at 22).

       1.    Clearly Established Supreme Court Law

The clearly established Supreme Court law governing claims of ineffective assistance of counsel was set forth *supra*.

       2.    Federal Review of State Court Decision

The state court determined that the fourth amended information properly charged Petitioner with lewd and lascivious assault or, alternatively, lewd and lascivious act (Doc. 12 Ex. H at 67). The state court found as fact that prior to charging the jury, the prosecutor clarified that it was proceeding under the theory of lewd and lascivious act, specifically, fondling, and not assault (*id.* at 68).  Additionally, the state court determined there was sufficient evidence in the record of Petitioner's inappropriate touching of Amanda Mortimer's sexual organs to survive motions to dismiss or for a new trial (*id.*).  Thus, the state court concluded any motion to dismiss on the grounds of error in the charging document or insufficiency of evidence would have been denied (*id.*). Additionally, the court also found that the record showed Petitioner's counsel moved for acquittal on Count Six, thus, Petitioner failed to show his counsel performed deficiently (*id.*).  The state court found that Petitioner was correct in his assertion that the verdict and written judgment and sentence erroneously identified the conviction as lewd and lascivious assault, rather that lewd and lascivious act; therefore, the state court directed the clerk of court to amend the judgment and sentence to reflect that Petitioner was convicted of lewd and lascivious act, not assault (*id.* at 68-69, 72). However, the state court concluded Petitioner failed to establish he was prejudiced by counsel's failure to object or move for acquittal or a new trial because sufficient evidence of Petitioner's lewd and lascivious acts was presented at trial (*id.* at 68).  Furthermore, Petitioner would not have received a lesser sentence because both lewd and lascivious act and lewd and lascivious assault are second degree felonies punishable by a maximum of fifteen years imprisonment (*id.* at 68-69).

Finally, the state court denied Petitioner's claim of constitutional error in counsel's failure to object to the trial court's sentencing Petitioner immediately after the jury rendered its verdict, on the ground that Petitioner failed to allege he was prejudiced by counsel's alleged error (*id.* at 69).

a.  Counsel's failure to move to dismiss Count Six

Petitioner's claim that the fourth amended information was "improperly duplicitous" is without merit.  A duplicitous indictment charges two or more separate and distinct crimes in a single count.  *See* United States v. Burton, 871 F.2d 1566, 1573 (11th Cir. 1989) (citations omitted).  Where a penal statute, such as FLA. STAT. § 800.04, prescribes several alternative ways in which the statute may be violated and each is subject to the same punishment, the indictment may charge any or all of the acts, in a single count, as constituting the same offense, and the State may satisfy its burden by proving that the defendant, by committing any one of the acts alleged, violated the statute.  *See id.* (citations omitted).  At the time of the offense conduct in Petitioner's case, section 800.04, Florida Statutes, identified several acts disjunctively and prescribed that each constituted a violation of the statute, provided that the act involved "handl[ing], fondl[ing] or mak[ing] an assault upon any child under the age of fourteen years in a lewd, lascivious or indecent manner . . . without committing the crime of sexual battery . . . ."  The acts of fondling and assaulting constituted two separate ways in which a violation of section 800.04 could occur, not two separate crimes. Therefore, Count Six of the fourth amended information, which charged that Petitioner "did unlawfully handle, fondle or make an assault upon a child under the age of sixteen (16) years . . . in a lewd and lascivious manner, without committing the crime of Sexual Battery, in violation of Section 800.04, Florida Statutes" (*see* Doc. 12, Ex. H at 98) was not duplicitous, and a motion to dismiss the indictment on that ground would not have been successful.  Accordingly, counsel's failure to make such a motion was not unreasonable.

b.  Counsel's failure to move for judgment of acquittal on Count Six

The record conclusively refutes Petitioner's claim that counsel performed deficiently by failing to move for judgment of acquittal on Count Six.  The trial transcript shows that counsel moved for a judgment of acquittal on all counts (Doc. 12, Ex. C at 327-30).  Therefore, Petitioner failed to establish counsel performed deficiently.

>    c.  Counsel's failure to move for new trial as to Count Six on the
> ground that the verdict was contrary to the law or the weight of the evidence

Petitioner claims the evidence was insufficient to convict him of lewd and lascivious assault on Amanda Mortimer.  Petitioner states the verdict convicted him of lewd and lascivious assault, however, the evidence showed only that he touched Amanda Mortimer's "lower part" where you "go to the bathroom" with "his hands."  Furthermore, during closing argument, the State argued only that Petitioner handled or fondled Amanda.  Additionally, Petitioner contends the trial court instructed the jury only on lewd assault, not on handling or fondling.  Therefore, Petitioner's conviction for lewd and lascivious assault was contrary to the law and evidence.

Initially, Petitioner's judgment of conviction and sentence was amended to reflect his conviction of lewd and lascivious act instead of lewd and lascivious assault, as to Count Six (*see* Doc. 12, Ex. H at 72).  To the extent Petitioner claims his counsel should have moved for a new trial on the ground that the evidence was insufficient to convict him of lewd and lascivious act in violation of section 800.04, he has failed to show he is entitled to relief.  As discussed *supra*, the fourth amended information charged Petitioner alternatively with handling, fondling, or making an assault upon Amanda Mortimer in a lewd and lascivious manner (Doc. 12, Ex. H at 97-98).  The State clarified on the record that it was proceeding only under the "fondling aspect" of Count Six (*id.* at 67-68).  The trial court instructed the jury that to find Petitioner guilty of Count Six, the State must prove two elements:  (1) Amanda Mortimer was under the age of 16 years, and (2) Petitioner handled or fondled or made an assault upon Amanda Mortimer in a lewd, lascivious, or indecent manner (Doc. 12, Ex. B at 402).  The State presented sufficient evidence that Petitioner violated section 800.04 by introducing testimony and statements of Amanda Mortimer that Petitioner touched her sexual organs with his hands (Doc. 12, Ex. B at 166-69, 206-07).  Therefore, Petitioner failed to show a reasonable probability that a motion for new trial would have been granted if counsel had made such a motion.  Furthermore, Petitioner has failed to show a reasonable probability he would have received a lesser sentence if he had been sentenced for lewd and lascivious act, rather than lewd and lascivious assault, as both violations of section 800.04 are second degree felonies punishable by up to fifteen years of imprisonment.  FLA. STAT. § 800.04.  Accordingly, he is not entitled to federal habeas relief.

        d.      Counsel's failure to object to the trial court's sentencing Petitioner immediately upon conclusion of trial

Petitioner next claims that his counsel performed in a constitutionally deficient manner by failing to object to the trial court's immediately sentencing him upon conclusion of the trial.  As the state court noted, Petitioner failed to allege he was prejudiced by the timing of the sentencing. Therefore, the state court's denial of the claim was not unreasonable.

     E.      Ground Five:  "Denial of Effective Assistance of Counsel"

Petitioner claims his counsel performed deficiently by failing to object to the trial court's response to a question from the jury during deliberations.  Plaintiff alleges the jury requested a transcript of Mary Mortimer's trial testimony.  The trial court, with no objection from counsel, responded that transcripts of witness testimony were not available.  Petitioner asserts counsel should have objected to the response as misleading because the Florida Rules of Criminal Procedure specifically provide that testimony may be read, and evidence such as the videotape of the interview with Mary Mortimer may be viewed upon request by the jury.  *See* Fla. R. Crim. P. 3.410.  Petitioner alleges he was prejudiced by counsel's failure to object because the jury could have acquitted him of the sexual battery charges involving Amanda Mortimer because Amanda testified at trial that she could not remember anything as to those counts, and Mary's trial testimony was inconsistent with her videotaped interview.

Respondent concedes Petitioner exhaust this claim in the state courts (Doc. 10 at 28).

       1.      <u>Clearly Established Supreme Court Law</u>

As discussed *supra*, the <u>Strickland</u> standard applies to claims of ineffective assistance of counsel.

       2.      <u>Federal Review of State Court Decision</u>

Petitioner raised this claim in his Rule 3.850 motion (Doc.12, Ex. G at 57-59).  The state court concluded Petitioner failed to sufficiently allege how he was prejudiced by counsel's failure to object (Doc. 12, Ex. H at 70).  Additionally, the court concluded Petitioner failed to show counsel had a meritorious basis for objection.  The court noted that under state law, the trial court is afforded wide latitude as to whether to read testimony requested by the jury; however, the court may not read testimony if it is misleading or likely to place undue emphasis on particular statements (*id.*).  The

state court found as fact that the trial court was concerned that reading Mary Mortimer's testimony may have placed undue weight or emphasis on her testimony in the eyes of the jury and may have misled them (*id.* at 71).  Thus, the state court concluded an objection by counsel would not have been sustained (*id.*).

Petitioner has failed to rebut with clear and convincing evidence the state court's factual finding that the trial court was concerned that the reading of Mary Mortimer's testimony may have placed undue emphasis on her testimony (*see* Doc. 12, Ex. H at 71); therefore, that fact is presumed correct.  Given the trial court's concern, as well as the fact that the jury did not ask to have the testimony read upon being advised that transcripts were not available, Petitioner failed to show a reasonable probability that an objection by counsel would have been sustained by the court.  *See* Garcia v. State, 644 So.2d 59, 62 (Fla. 1994) (no abuse of discretion in trial court's reading of portions of trial testimony to jury and failing to read others, where portions read were directly related and responsive to jury's interrogatory, and they were not misleading and did not place undue emphasis on any particular statements); *see also* Simmons v. State, 334 So.2d 265, 267 (Fla. 3d DCA 1976) (it is within the trial court's discretion to have testimony read back to the jury upon request; however, no abuse of discretion in trial court's failure to read testimony to jury where jury did not ask to have testimony read, and instead requested a typewritten copy of the testimony of two witnesses, when a typewritten copy was not available).  Therefore, the state court decision denying Plaintiff's ineffective assistance claim was not unreasonable.

F.       Ground Six:    "Denial of Effective Assistance of Counsel"

As Petitioner's final claim, he asserts he received ineffective assistance of counsel due to counsel's failure to object to the trial court's permitting the videotapes of the child victims' interviews with the child protection team nurse to be placed in the jury room during deliberations (Doc. 1 at 6l-6m).  Petitioner speculates that the jury actually viewed the videotapes and placed more emphasis on the interviews than other testimony and evidence (Doc. 1 at 6m-6n).

Respondent concedes Petitioner exhausted this claim in the state courts (Doc. 10 at 34).

1.       Clearly established Supreme Court Law

As discussed *supra*, the Strickland standard applies to claims of ineffective assistance of counsel.

2.     Federal Review of State Court Decision

Petitioner raised this claim in his Rule 3.850 motion (Doc. 12, Ex. G at 60-61).  The state court found as fact that counsel objected to the trial court's allowing the videotapes to go to the jury room; therefore, Petitioner's claim was without merit (Doc. 12, Ex. H at 71).

Indeed, the record shows Petitioner's counsel objected to the placement of the evidence in the jury room during deliberations (Doc. 12, Ex. B at 416-17).  Therefore, the state court decision denying Petitioner's ineffective assistance claim was not unreasonable.

For the foregoing reasons, it is, therefore, respectfully **RECOMMENDED**:

That the petition for writ of habeas corpus (Doc. 1) be **DENIED** with prejudice.

At Pensacola, Florida, this 3rd day of June, 2005.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**Objections to these proposed findings and recommendations may be filed within ten days after being served a copy thereof.  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**